

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-09-087-CV

IN THE INTEREST OF E.G., A CHILD

------------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In one issue, Appellant Mother appeals the termination of her parental rights by challenging the sufficiency of the evidence to support the trial court's best interest finding.  We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

Mother was fourteen years old when she gave birth to E.G. in September 2006. A year later, Child Protective Services ("CPS") removed E.G. from her care and the Department of Family and Protective Services ("DFPS") filed a petition to terminate her parental rights.

A jury rendered a verdict of termination in the trial held in February 2009 before an associate judge, and Mother sought a de novo hearing in the county court at law. *See* Tex. Fam. Code Ann. § 201.015 (Vernon Supp. 2009). The county court at law took judicial notice of the entire jury trial record and, after hearing additional evidence, issued the order terminating Mother's parental rights to E.G. Like the jury in the original trial, the county court found that Mother had constructively abandoned E.G., that Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain E.G.'s return to her, and that termination of Mother's parental rights to E.G. would be in E.G.'s best interest. *See id*. § 161.001(1)(N), (O), (2) (Vernon Supp. 2009). This appeal followed.

## III. Legal and Factual Sufficiency

In her sole issue, Mother argues that the evidence was insufficient to show that it is in E.G.'s best interest to terminate Mother's parental rights.

2

## A. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground

listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2002). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

With regard to the best interest finding challenged here, when we review the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the best interest ground was proven. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed

4

evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

5

**B. Best Interest of the Child**

**1. Law**

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). Among others, the following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others w0ho have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the desires of the

6

child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### 2. Analysis

Mother asserts that she is a good mother and was doing a good job of taking care of E.G. when E.G. was removed from her, that E.G. was never abused or neglected, that she provided E.G. with a safe environment, and that

7

she completed her court-ordered services and maintained significant and meaningful contact with E.G. after the removal.

However, Mother's own testimony during the jury trial and at the trial de novo contradicts some of her assertions: she testified at the jury trial that before E.G.'s removal, she would smoke marijuana and then interact with E.G. while still feeling the effects of the marijuana, although "not very many" times. She also agreed that she visited E.G. only forty-eight times out of a possible 142 visits after E.G.'s removal, and that she had been withdrawn from school for excessive absences.[2] Both the visits and school attendance were service plan requirements.[3] At the trial de novo, Mother acknowledged that she did not do everything that she needed to do to have E.G. returned to her.

And although Mother was supposed to stay away from drugs as part of her service plan, her caseworker testified that Mother admitted that she used

---

[2] E.G. was removed from Mother when Mother left her with someone else so that Mother could attend truancy court. Mother testified that she missed some of the visits because of her work schedule. The CPS caseworker testified that Mother's visitation schedule was modified four or five times to accommodate Mother's work schedule.

[3] Mother completed the eight parenting classes initially required in her service plan, and she completed a drug and alcohol assessment. She completed half of her required counseling. Mother did not complete the additional eight parenting classes that CPS set up at the recommendation of the parenting class provider and that the court ordered, nor did she complete the activities the court ordered that she could do in lieu of the additional classes.

marijuana and that Mother tested positive for marijuana on the drug test she took a few weeks before the jury trial.[4] Mother admitted to this at the trial de novo, stating that it had been over a month since the last time she had smoked "pot" and that it was before the jury trial. Furthermore, with regard to E.G.'s condition at removal, the CPS caseworker testified that E.G. had been wearing a dirty diaper put on backwards, had a diaper rash, was dirty, and had a bad odor, and that "her clothes were so small that . . . her toes were curled up in her shoes."

Mother argues that she and E.G. are bonded to one another and that the jury just determined that the foster parents were better for E.G. than "an inconsistently employed 15-year old mother with unstable housing who is a good parent," but the record does not entirely support this argument, and the county court had other factors to consider besides whether E.G. and Mother were bonded that weighed in favor of termination. *See* Tex. Fam. Code Ann. § 263.307(b); *R.R.*, 209 S.W.3d at 116; *see also Holley*, 544 S.W.2d at 371–72. Mother's testimony about her bond with E.G. was undisputed.

---

[4] The CPS caseworker testified that in discussing one of Mother's sisters, who also had an open CPS case, Mother stated that "at least [Mother] only did marijuana," and not the particular drug her sister used.

9

Mother was fifteen years old when E.G. was removed, but she was almost seventeen years old at the jury trial, and she was seventeen at the trial de novo. It is undisputed that she was inconsistently employed: she testified that she quit her job of five months at Sonic around a month before trial and that she worked for Church's Chicken for two months before that. She testified at the jury trial that she did not "do [anything] during the days" other than help her grandmother with cooking and cleaning.[5] Mother was still unemployed at the time of the trial de novo, although she testified that she had a job interview lined up for the following week at a fast food restaurant.

It is also undisputed that Mother had unstable housing: she testified at the jury triazl that she had lived with her legally disabled grandmother for almost five months (in three locations), with one of her sisters for the three months before that, and with a friend of the family at the time of E.G.'s removal. At the trial de novo a little over a month later, Mother testified that

---

[5] At the jury trial, Mother testified that, even though she had not taken the GED exam, she planned to start school at Vernon College to study to become a certified LVN nurse's aide and that she would be working there, making $10.50 an hour. She admitted that she did not know how much she would have to pay for day care, that she was not yet enrolled in the nurse's aide program, and that she did not know what an LVN was. Mother had not enrolled in the program by the time of the trial de novo over a month later.

she had moved again and was living with a family friend whose last name she did not know "right offhand," but who she had known for around three years.

The county court could have determined, based on the jury trial record and Mother's subsequent testimony at the trial de novo, that termination of Mother's parental rights was in E.G.'s best interest because, in addition to the testimony discussed above, Mother testified that her plans for E.G. were "[t]o take care of her like I [was] before y'all took her."[6] She testified that she did not take E.G. for her immunizations because,

> [w]hen [my sister] took her son to get his immunizations, the way—the way they done him and the way they made him feel, he was in—I mean, he couldn't do nothing. He couldn't walk because he was so sore, his body. I wasn't going to make my baby have them shots.[7]

Mother also testified that her mother had problems and was not very supportive,[8] that she had no contact with any father figure, and that one of her sisters also had an open CPS case. E.G. had been in foster care for fifteen months by the time of the jury trial.

---

[6] Mother stated that she did not think that the foster parents "can do anything different than I can do. They're getting paid for my baby."

[7] Mother testified that this concern had nothing to do with recent news about thymerosol, a preservative in some vaccines, and its potential connection to autism.

[8] On the same day that E.G. was removed from Mother, Mother was removed from her own mother and placed in a teen shelter.

Additionally, Mother's CPS caseworker testified that appointing Mother E.G.'s sole managing conservator would significantly impair E.G.'s physical or emotional development based at least in part on Mother's family's extensive CPS history and drug use;[9] that E.G.'s foster parents loved E.G., had a stable home and employment, and were interested in adopting her; and that E.G.'s adoption by her foster parents would be in E.G.'s best interest.

E.G.'s court-appointed special advocate testified that E.G. was flourishing with her foster parents and that E.G. called them "Mommy and Daddy," although she also called Mother "Mom" at visitations. She testified that she was unsuccessful in contacting Mother at any of the five addresses she had for her but was successful in meeting with her at truancy court. She recommended termination of Mother's parental rights, and she testified that the foster parents were in a better position to take care of E.G.'s emotional and physical needs and had better parenting abilities; that if E.G. were adopted by the foster parents, E.G. would receive tuition at a four-year college and health care until age eighteen under the programs available to assist adopting foster parents; and that it was not in E.G.'s best interest to be returned to Mother.

---

[9] On cross-examination, the CPS caseworker admitted that she could not think of any emotional harm that could come to E.G. from Mother's failure to attend school or from her constant housing changes.

Viewing the evidence in the light most favorable to the finding and judgment, we conclude that the county court could have reasonably formed a firm belief or conviction that the best interest ground was proven such that the evidence is legally sufficient to support that finding. *See J.P.B.*, 180 S.W.3d at 573. Furthermore, in light of the entire record, we conclude that the county court could have reasonably formed that same firm conviction or belief, such that the evidence is factually sufficient to support the best interest finding. *See C.H.*, 89 S.W.3d at 28. Therefore, we overrule Mother's sole issue.

## IV. Conclusion

Having overruled Mother's sole issue, we affirm the county court's judgment.

PER CURIAM

PANEL: MCCOY, DAUPHINOT, and GARDNER, JJ.

DELIVERED: October 15, 2009

13